IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

LEATRICE BURGESS-LESTER, as
Conservator of the Person and
Estate of BARBARA JENICE LESTER,

        Plaintiff,

v.                //   CIVIL ACTION NO. 1:06CV43
                         (Judge Keeley)

FORD MOTOR COMPANY,
A Delaware Corporation,

        Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING THE DEFENDANT'S MOTION TO VACATE THE COURT'S ORDER GRANTING THE PLAINTIFF'S MOTION FOR SUBSTITUTION OF COUNSEL

Pending is the Defendant's Motion to Vacate the Court's Order Granting the Plaintiff's Motion for Substitution of Counsel (dkt. no. 328). For the reasons that follow, the Court **GRANTS** the defendant's Motion to Vacate (dkt. no. 328) and **VACATES** its previous Order granting the Plaintiff's motion to substitute counsel (dkt. no. 322).

## I. Procedural History

On August 11, 2008, Leatrice Burgess-Lester ("Lester") filed a motion to substitute Benjamin L. Bailey ("Bailey") of the law firm Bailey & Glasser ("BG") as co-counsel to her lead attorney, Edgar F. Heiskell, III, and for Bailey to replace previous co-counsel, J. Miles Morgan ("Morgan"). (Dkt. no. 320.) Lester's motion stated that neither she nor the defendant Ford Motor Company ("Ford") would be prejudiced by the substitution, that Morgan had

**MEMORANDUM OPINION AND ORDER GRANTING THE DEFENDANT'S MOTION
TO VACATE THE COURT'S ORDER GRANTING THE PLAINTIFF'S
MOTION FOR SUBSTITUTION OF COUNSEL**

acknowledged his desire to withdraw and Lester's consent to his withdrawal, and that Bailey had certified that he was aware of the time frames for this case, including the trial date of November 3, 2008, and had agreed to abide by the scheduling orders in this case. On the basis of those representations, on August 18, 2008, the Court granted Lester's motion to substitute counsel.

Subsequently, on August 25, 2008, Ford responded to Lester's motion, in which it opposed substitution of Bailey as co-counsel and moved the Court to vacate its August 18, 2008, Order (dkt. no. 328). Ford argued that, pursuant to Rule 1.10(b) and 1.9(b) of the West Virginia Rules of Professional Conduct, BG and its attorneys are disqualified from representing Lester because a current attorney at BG, Robert P. Lorea ("Lorea"), was previously associated with the law firm of Flaherty, Sensabaugh & Bonasso ("FSB"), which represents Ford. Allegedly, while at FSB Lorea worked on a number of Ford's cases, including performing a minimal amount of work on this case. Ford argues that, because BG's representation in this case is substantially related to the matters for Ford on which Lorea worked while at FSB, and because

## MEMORANDUM OPINION AND ORDER GRANTING THE DEFENDANT'S MOTION TO VACATE THE COURT'S ORDER GRANTING THE PLAINTIFF'S MOTION FOR SUBSTITUTION OF COUNSEL

confidential information can be imputed to BG and its attorneys, BG and Bailey should be disqualified from representing Lester.[1]

Lester, however, asserts that Bailey may act as her co-counsel for two reasons. First, BG hired Lorea before Lester retained BG. Second, before Bailey agreed to represent Lester, BG implemented adequate screening measures to ensure both that Lorea would not be involved in this representation and also that there would be no appearance of impropriety.

In reply, Ford contends that Lorea received confidential information from Ford while working on Ford's matters at FSB, although it fails to specify what confidential information Lorea received. It also argues that decisions by other courts disfavor screening, and that the commentary to Rule 1.10 favors disqualification in situations similar to those in the case at bar.

## II. Applicable Law

The rules governing the conduct of lawyers practicing before the United States District Court for the Northern District of West Virginia are the "Rules of Professional Conduct, as adopted by the

---

[1] Ford has not alleged any actual impropriety on the part of Bailey, Lorea, or Bailey & Glasser. Nor has it provided, in camera or otherwise, detailed descriptions of the actual work Lorea performed for Ford while working at FSB.

## MEMORANDUM OPINION AND ORDER GRANTING THE DEFENDANT'S MOTION TO VACATE THE COURT'S ORDER GRANTING THE PLAINTIFF'S MOTION FOR SUBSTITUTION OF COUNSEL

Supreme Court of Appeals of West Virginia." <u>See</u> Local Rule of General Procedure 83.05 Ethical Considerations (2006)(Emphasis omitted).  Although the Rules of Professional Conduct ("RPC") in West Virginia are not the same as the Model Rules of Professional Conduct ("Model Rules") adopted by the American Bar Association ("ABA"), the RPC bear a substantial similarity to the Model Rules. Given this similarity, the Court will consider the interpretations courts have given to both the Model Rules and the RPC in deciding the parties' conflict in this case.

Under Rule 1.9(b), a lawyer who has previously represented a client must not afterwards "use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client or when the information has become generally known."  This conflict may arise when an attorney leaves one firm and joins a new one.  If such a conflict does arise, the new firm

> may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(b) that is material to the matter.

4

**MEMORANDUM OPINION AND ORDER GRANTING THE DEFENDANT'S MOTION
TO VACATE THE COURT'S ORDER GRANTING THE PLAINTIFF'S
MOTION FOR SUBSTITUTION OF COUNSEL**

W. Va. R. Prof'l Conduct R. 1.10(b) (2007). When determining whether a firm is representing a client in a substantially related proceeding adverse to a former client of the conflicted attorney, the inquiry must focus on whether the attorney received "information protected by Rules 1.6 and 1.9(b) that is material to the matter." <u>Id.</u>

It is imperative, however, in all conflicts of interest related to the attorney-client relationship to avoid the appearance of impropriety, because "[i]t is the glory of the legal profession that its fidelity to its clients can be depended upon; that a man may safely go to a lawyer and converse with him upon his rights in litigation with the absolute assurance that [the] lawyer's tongue is tied from ever discussing it." <u>Gray v. State</u>, 469 So. 2d 1252, 1255 (<u>quoting</u> <u>People v. Gerold</u>, 107 N.E. 165, 175 (Ill. 1914)). "Anything less than the strictest safeguarding by the lawyer of a client's confidences would irreparably erode the sanctity of the lawyer-client relationship." <u>State ex rel. Keenan v. Hatcher</u>, 557 S.E.2d 361, 367 (W. Va. 2001) (<u>quoting</u> <u>State ex rel. Ogden Newspapers v. Wilkes</u>, 482 S.E.2d 204, 207 (W. Va. 1996)). Thus, to preserve the value and sanctity of the attorney-client relationship, courts resolving conflicts of interest must "resolve

**MEMORANDUM OPINION AND ORDER GRANTING THE DEFENDANT'S MOTION
TO VACATE THE COURT'S ORDER GRANTING THE PLAINTIFF'S
MOTION FOR SUBSTITUTION OF COUNSEL**

all doubts in favor of disqualification" in order to "prevent[] 'the appearance of impropriety.'" <u>United States v. Clarkson</u>, 567 F.2d 270, 273 n.3 (4th Cir. 1977).

## A. The Option of Screening

Under both the RPC and the ABA's Model Rules, screening is an adequate remedy to cure conflicts of interest in which a former government attorney has entered private practice, and his new law firm is representing a client in a matter in which the former government attorney directly participated. <u>See</u> W. Va. R. Prof'l Conduct R. 1.11(a)(2007); Model Rules of Prof'l Conduct R. 1.11(a), (b) (2008). Neither the RPC nor the Model Rules, however, have addressed whether screening is adequate to cure conflicts when a private attorney leaves one firm for another and his new firm is representing a client in a matter in which that lawyer or his former firm directly participated.

During the revision of its Model Rules, the ABA considered whether to allow screening as a remedy for conflicts of interest when private attorneys change firms. The ABA's Ethics 2000 Commission recommended "that Rule 1.10 include a provision for screening lateral hires." 15 NO. 1 Prof. Law. 14 (2004), <u>available at</u> http://www.abanet.org/cpr/jclr/review_art.pdf (updated November

**MEMORANDUM OPINION AND ORDER GRANTING THE DEFENDANT'S MOTION
TO VACATE THE COURT'S ORDER GRANTING THE PLAINTIFF'S
MOTION FOR SUBSTITUTION OF COUNSEL**

30, 2007) (last visited Oct. 8, 2008). Those amendments, however, were not adopted by the ABA, and Rule 1.10 thus does not expressly allow screening for conflicts of interest when private attorneys change firms.

Despite this, some courts have permitted screening, or the creation of an ethical wall,[2] as a mechanism to remedy conflicts of interest. See Hempstead Video, Inc. v. Inc. Village of Valley Stream, 409 F.3d 127, 138 (2d Cir. 2005) ("We see no reason why, in appropriate cases and on convincing facts, isolation-whether it results from the intentional construction of a 'Chinese Wall,' or from de facto separation that effectively protects against any sharing of confidential information-cannot adequately protect against taint."); Cromley v. Bd. of Educ. of Lockport Twp. High School Dist., 17 F.3d 1059, 1065 (7th Cir. 1994) (stating that the

---

[2] An ethical wall is defined as "[a] screening mechanism that protects a client from a conflict of interest by preventing one or more lawyers within an organization from participating in any matter involving that client. This mechanism is designed to allow a lawyer to move to a new job without the fear of vicariously disqualifying the new employer from representing certain clients. Creating an ethical wall generally entails (1) prohibiting certain lawyers and paralegals from having any connection with the matter; (2) banning discussions with or the transfer of documents to those individuals; (3) restricting access to files; and (4) educating all members of the firm, corporation, or entity about the separation of the lawyers and paralegals (both organizationally and physically) from the pending matter." Black's Law Dictionary (8th ed. 2004).

**MEMORANDUM OPINION AND ORDER GRANTING THE DEFENDANT'S MOTION
TO VACATE THE COURT'S ORDER GRANTING THE PLAINTIFF'S
MOTION FOR SUBSTITUTION OF COUNSEL**

presumption of shared confidence could be rebutted by showing that an ethical screen had been timely established); <u>Manning v. Waring, Cox, James, Sklar & Allen</u>, 849 F.2d 222, 225 (6th Cir. 1988) (same); <u>EZ Paintr Corp. v. Padco, Inc.</u>, 746 F.2d 1459, 1462 (Fed. Cir. 1984) (same).

In the seminal case of <u>Schiessle v. Stephens</u>, 717 F.2d 417 (7th Cir. 1983), the Seventh Circuit articulated a balanced and straightforward test to determine the adequacy of a screening procedure to remedy an otherwise imputed disqualification of an entire firm. There, an attorney whose firm had yet to enter an appearance in an antitrust case contacted the plaintiff's lawyer to ask whether the plaintiff would dismiss its suit against the defendants. <u>Id.</u> at 418. While the plaintiff's attorney indicated that no dismissal would be forthcoming, he did state that the plaintiff would consider a settlement offer. <u>Id.</u> After this discussion, and approximately three weeks before his former firm entered an appearance on behalf of the defendants, the attorney who had contacted plaintiff's counsel joined that counsel's law firm. <u>Id.</u>

Almost two years later, the defendants moved to disqualify the plaintiff counsel's entire law firm because the attorney who

8

**MEMORANDUM OPINION AND ORDER GRANTING THE DEFENDANT'S MOTION
TO VACATE THE COURT'S ORDER GRANTING THE PLAINTIFF'S
MOTION FOR SUBSTITUTION OF COUNSEL**

had previously worked for the defendants' counsel's law firm was now a partner in the plaintiff counsel's firm. <u>Id.</u> at 419. Although the plaintiff objected to the motion, the trial court disqualified plaintiff counsel's firm from further participation in the case. <u>Id.</u>

On appeal, the Seventh Circuit enunciated a three-part test to determine whether disqualification is proper in a given case. <u>Id.</u> at 420-21. The first prong of the test requires a court to "determine whether a substantial relationship exists between the subject matter of the prior and present representations." <u>Id.</u> at 420. Once it is established that the two representations are substantially related, a court "must determine whether the attorney whose change of employment created the disqualification issue was actually privy to any confidential information his prior law firm received from the party now seeking disqualification of his present firm." <u>Id.</u> Finally, a "court must determine whether the knowledge of the 'confidences and secrets' of the [party moving for disqualification] which [the attorney changing firms] brought with him has been passed on to or is likely to be passed on to the members of [his new] firm." <u>Id.</u> at 421.

**MEMORANDUM OPINION AND ORDER GRANTING THE DEFENDANT'S MOTION
TO VACATE THE COURT'S ORDER GRANTING THE PLAINTIFF'S
MOTION FOR SUBSTITUTION OF COUNSEL**

Applying this test, the court in <u>Schiessle</u> determined that a substantial relationship existed between the conflicted attorney's prior and present representation, noting that the subject matter concerned the same antitrust litigation.  The conflicted attorney, therefore, was "privy to [his former client's] confidential information" because he was the "partner in charge" of the case at his former law firm.  <u>Id.</u> at 420.  He not only had discussed the case with the defendants while at his former firm, but he also had engaged in "numerous discussions" with other lawyers at his former firm regarding the case.  <u>Id.</u> at 420-21.  Therefore, in order to prove that his current firm should be disqualified from participating in the case, the conflicted attorney had to rebut the presumption that the confidences he possessed were imputed to his current firm.  <u>Id.</u> at 421.

The Seventh Circuit stated that this presumption could be rebutted by showing "that 'specific institutional mechanisms' (e.g., 'Chinese Walls') had been implemented to effectively insulate against any flow of confidential information from the 'infected' attorney to any other member of his present firm."  <u>Id.</u> (quoting <u>LaSalle Nat'l Bank v. County of Lake</u>, 703 F.2d 252, 259 (7th Cir. 1983)).  It also stated that a determination of the

**MEMORANDUM OPINION AND ORDER GRANTING THE DEFENDANT'S MOTION
TO VACATE THE COURT'S ORDER GRANTING THE PLAINTIFF'S
MOTION FOR SUBSTITUTION OF COUNSEL**

effectiveness of the "institutional mechanism" should be made on "a case-by-case basis." Id.  Among the factors to consider in this determination were "the size and structural divisions of the law firm involved, the likelihood of contact between the 'infected' attorney and the specific attorneys responsible for the present representation, the existence of rules to prevent the 'infected' attorney from accessing relevant files or other information pertaining to the present litigation, or prevent him from sharing in the fees derived from such litigation." Id. (citing LaSalle, 703 F.2d at 259).

Taking these factors into consideration, the Seventh Circuit determined that there was "no evidence . . . in the record establishing that the [plaintiff counsel's] firm [had] 'institutional mechanisms' in effect insulating [the conflicted attorney] 'from all participation in and information about the case.'" Id. (quoting LaSalle, 703 F.2d at 257).  It stated that "the plaintiff informed the court at oral argument that the [plaintiff counsel's] firm was without 'formal institutionalized . . . screening' insulating [the infected attorney] from the members of the firm representing the plaintiff." Id.  Therefore, the court disqualified the plaintiff counsel's firm. Id.

**MEMORANDUM OPINION AND ORDER GRANTING THE DEFENDANT'S MOTION
TO VACATE THE COURT'S ORDER GRANTING THE PLAINTIFF'S
MOTION FOR SUBSTITUTION OF COUNSEL**

**B.  Screening in the Fourth Circuit**

Neither the United States Court of Appeals for the Fourth
Circuit nor the West Virginia Supreme Court of Appeals has ruled on
whether the creation of an ethical screen is an adequate and
appropriate mechanism for dealing with conflicts of interest when
attorneys change firms.  In <u>Clarkson</u>, however, the Fourth Circuit
stated:

> In determining whether to disqualify counsel
> for conflict of interest, the trial court is
> not to weigh the circumstances "with hair-
> splitting nicety" but, in the proper exercise
> of its supervisory power over the members of
> the bar and with a view of preventing "the
> appearance of impropriety," it is to resolve
> all doubts in favor of disqualification.

567 F.2d at 273 n.3.  This language does not indicate that
screening is always an ineffective tool for remedying conflicts of
interest.  Rather, it implies that, when a court is considering
whether a screening procedure is adequate, it does not have to
examine the procedure "with hair-splitting nicety."  <u>Id.</u>  If the
court has doubts as to the propriety of the procedure, "it is to
resolve all [its] doubts in favor of disqualification" in order to
avoid "the appearance of impropriety."  <u>Id.</u>

**MEMORANDUM OPINION AND ORDER GRANTING THE DEFENDANT'S MOTION
TO VACATE THE COURT'S ORDER GRANTING THE PLAINTIFF'S
MOTION FOR SUBSTITUTION OF COUNSEL**

Judges in this district, as well as the Southern District of West Virginia, have considered screening in particular circumstances and, after careful consideration of Rules 1.9 and 1.10, have concluded that screening did not remedy the conflicts of interest imputed to law firms in those cases. See CSX Transp., Inc. v. Gilkison, No. 5:05CV202, slip op., 2006 WL 3203419 at *5 (N.D.W. Va. Nov. 3, 2006)(Stamp, J.)(stating that "because a conflict of interest exists pursuant to Rule 1.10(b) and such conflict cannot lawfully be allayed by screening, disqualification is necessary"); HealthNet, Inc. v. Health Net, Inc., 289 F. Supp.2d 755, 761 (S.D.W. Va. 2003)(Goodwin, J.)(stating that the court was "not as confident as the parties that the screening of conflicted attorneys moving between private law firms exempts the firms from Rule 1.10"); and Roberts & Schaefer Co. v. San-Con, Inc., 898 F. Supp. 356, 363 (S.D.W. Va. 1995)(Goodwin, J.)("[T]he Court is troubled by the trend to dispose of centuries-old confidentiality rules solely for the convenience of modern lawyers who 'move from one association to another several times in their careers.'"(citation omitted)).

This Court, therefore, must determine whether the screening measures employed by BG in this case are adequate to stave off its

**MEMORANDUM OPINION AND ORDER GRANTING THE DEFENDANT'S MOTION
TO VACATE THE COURT'S ORDER GRANTING THE PLAINTIFF'S
MOTION FOR SUBSTITUTION OF COUNSEL**

disqualification.   In so doing, it must "resolve all doubts in favor of disqualification."  <u>Clarkson</u>, 567 F.2d at 273 n.3.

### III. Analysis

According to Bailey, BG began screening Lorea before it agreed to represent Lester.  (<u>See</u> dkt. no. 339 at 3); <u>see also</u> Affidavit of Benjamin L. Bailey p.2, (dkt. no. 339) at Exhibit B-2.  First, BG restricted Lorea's access to any computer files pertaining to Lester's case.   Second, it stored all the physical documents related to the case in a physical location to which Lorea had no access.   Third, it instructed its personnel that these documents were only to be given to lawyers working on the case and informed them not to discuss the case with Lorea.  Finally, BG arranged that Lorea would not receive any profits from the resolution of the case.  (Dkt no. 339 at 2-3.)

As noted earlier in this Memorandum Opinion, the Fourth Circuit has not adopted a <u>per</u> <u>se</u> rule against screening, and this Court does not adopt such a rule here.   Rather, to determine whether the screening measures employed by BG avoid the appearance of impropriety, it will follow the three-part test in <u>Schiessle</u> because, in that case, the Seventh Circuit "[took] the most realistic view of the methodology to be followed in resolving

**MEMORANDUM OPINION AND ORDER GRANTING THE DEFENDANT'S MOTION
TO VACATE THE COURT'S ORDER GRANTING THE PLAINTIFF'S
MOTION FOR SUBSTITUTION OF COUNSEL**

competing interests raised by such a disqualification motion."
Manning, 849 F.2d at 225.

Under that test, pursuant to Rule 1.10(b) the Court must first
determine, whether "a substantial relationship exists between the
subject matter of the prior and present representations."
Schiessle, 717 F.2d at 420.  In CSX, Judge Stamp concluded that
"two representations are substantially related 'if the lawyer could
have obtained confidential information in the first representation
that would have been relevant in the second.'"  2006 WL 3203419 at
*4 (quoting Analytica, Inc. v. NPD Research, Inc., 708 F.2d 1263,
1266 (7th Cir. 1983)).

Here, it is undisputed that Lorea worked on Ford matters at
FSB.  Although Ford provided no detailed description of Lorea's
scope of work on Ford's motions at FSB, it at least documented that
Lorea "devoted between [55 and 60] percent of his chargeable hours
to Ford."  (Dkt. no. 365 at 3.)  It also proffered that
"approximately [6] percent of [Lorea's] time was recorded on Ford
matters involving a total of six Bronco II cases."  Id. at 5.
Additionally, according to FSB, Lorea worked closely with members
of the firm's products liability practice group and was considered
"an integral part of that . . . group."  Affidavit of Michael

15

**MEMORANDUM OPINION AND ORDER GRANTING THE DEFENDANT'S MOTION
TO VACATE THE COURT'S ORDER GRANTING THE PLAINTIFF'S
MOTION FOR SUBSTITUTION OF COUNSEL**

Bonasso p.2, (dkt. no. 378-2.)  Through this work, Lorea became "intimately familiar with Ford's case handlers and Ford's practices with regard to handling cases, including the manner in which cases are evaluated for purposes of settlement or trial."  <u>Id.</u>  From these sworn representations, the Court concludes that Lorea gained confidential information with regard to Ford during the course of his "first representation."  <u>CSX</u>, 2006 WL 3203419 at *4 (<u>quoting Analytica, Inc. v. NPD Research, Inc.</u>, 708 F.2d 1263, 1266 (7th Cir. 1983)).

This case involves an accident in which Lester's daughter, Barbara, was injured while driving a Ford Bronco II.  According to the time records submitted by FSB and the affidavit of Michael Bonasso, while at FSB Lorea worked on Ford Bronco II litigation and billed 27 hours of work to a companion case, <u>Sandridge v. Ford Motor Company</u>, which involved passengers in the Bronco II driven by Barbara Lester.  (<u>See</u> dkt. nos. 378-2, 378-3.) Ford asserts that, through his work on these cases, Lorea gained insight into Ford's litigation strategies involving Bronco II roll-over accidents, and, through the <u>Sandridge</u> case, about issues that could harm Ford in Lester's litigation.  Concerning Lester's case, through numerous informal discussions with Ford's counsel, Alonzo D. Washington, and

**MEMORANDUM OPINION AND ORDER GRANTING THE DEFENDANT'S MOTION
TO VACATE THE COURT'S ORDER GRANTING THE PLAINTIFF'S
MOTION FOR SUBSTITUTION OF COUNSEL**

by billing 0.4 hours on the case while at FSB, Lorea gained confidential attorney-client information specific to this litigation. See Affidavit of Alonzo D. Washington p.2, (dkt. no. 378-4); (dkt. no. 365 at 5.) Moreover, documents submitted by FSB establish that, while at the firm, Lorea worked on 86 Ford or Ford-related matters and billed a total of 8,143.57 hours. Affidavit of Michael Bonasso p.3, (dkt. no. 378-2); (dkt. no. 378-3.)

Inasmuch as this case concerns an injury resulting from an accident in which Barbara Lester was driving a Ford Bronco II, the confidential information Lorea acquired about Ford while at FSB, including information about the Sandridge litigation, is directly related to Lester's case. See CSX, 2006 WL 3203419 at *4 (quoting Analytica, 708 F.2d at 1266) (stating that "two representations are substantially related 'if the lawyer could have obtained confidential information in the first representation that would have been relevant in the second'"). Therefore, the confidential information obtained by Lorea "in the first representation" is relevant to BG's representation of Lester in the present case, and the two matters, thus, are substantially related. Id.

Once a court determines that the two representations are substantially related, under the second factor of Schiessle it must

**MEMORANDUM OPINION AND ORDER GRANTING THE DEFENDANT'S MOTION
TO VACATE THE COURT'S ORDER GRANTING THE PLAINTIFF'S
MOTION FOR SUBSTITUTION OF COUNSEL**

"determine whether the attorney whose change of employment created the disqualification issue was actually privy to any confidential information his prior law firm received from the party now seeking disqualification of his present firm." Schiessle, 717 F.2d at 420. According to West Virginia law, "[o]nce a former client establishes that the attorney is representing another party in a substantially related matter, the former client need not demonstrate that he divulged confidential information to the attorney as this will be presumed." McClanahan, 430 S.E.2d at Syl. Pt. 4.

Over half of Lorea's workload at FSB consisted of Ford matters. Moreover, approximately six (6) percent of Lorea's Ford work involved six Bronco II cases, which included this case and its companion case, Sandridge. (Dkt. no. 365 at 5.) Lester now wants BG, Lorea's present employer, to represent her in the case at bar. Given that Lorea's representation of Ford while employed at FSB is substantially related to BG's current representation of Lester, West Virginia law presumes that Ford divulged confidential information to Lorea. See McClanahan, 430 S.E.2d at Syl. Pt. 4 ("Once a former client establishes that the attorney is representing another party in a substantially related matter, the

**MEMORANDUM OPINION AND ORDER GRANTING THE DEFENDANT'S MOTION
TO VACATE THE COURT'S ORDER GRANTING THE PLAINTIFF'S
MOTION FOR SUBSTITUTION OF COUNSEL**

former client need not demonstrate that he divulged confidential information to the attorney as this will be presumed.").

Finally, pursuant to the third factor from <u>Schiessle</u>, whenever a court determines that the representations are substantially related, and also that confidential information was communicated from the former client to the tainted attorney, it "must determine whether the knowledge of 'confidences and secrets' [that the tainted attorney brought with him] has been passed on to or is likely to be passed on to the members" of the attorney's new firm. <u>Schiessle</u>, 717 F.2d at 421.  This presumption can be rebutted by showing that screening has "been implemented to effectively insulate against any flow of confidential information from the 'infected' attorney to any other member of his present firm." <u>Id.</u> (<u>citing</u> <u>LaSalle</u>, 703 F.2d at 259).  However, in the Fourth Circuit, in order to avoid "'the appearance of impropriety,' [a court] is to resolve all doubts in favor of disqualification" without regard for "hair-splitting nicety." <u>Clarkson</u>, 567 F.2d at 273 n.3.

BG employs twenty-four attorneys in three cities, including two locations in Charleston, West Virginia.  Affidavit of Benjamin L. Bailey pp.1-2, (dkt. no. 339) at Exhibit B-2.  With BG's twenty-

**MEMORANDUM OPINION AND ORDER GRANTING THE DEFENDANT'S MOTION
TO VACATE THE COURT'S ORDER GRANTING THE PLAINTIFF'S
MOTION FOR SUBSTITUTION OF COUNSEL**

four attorneys scattered among four locations, the Court cannot ignore the likelihood that "contact between [Lorea] and the specific attorneys responsible for the present representation" occurs on a daily basis. <u>Schiessle</u>, 717 F.2d at 421 (<u>citing</u> <u>LaSalle</u>, 703 F.2d at 259).

Lester emphasizes the fact that BG implemented the screen before it accepted the representation in the case at bar. Indeed, Bailey states in his affidavit that Lorea's compensation will not "be affected in any way by the outcome of this matter." Moreover, at Bailey's insistence, BG introduced several policies and rules intended to screen Lorea from any contact with the case. Nevertheless, although BG employees assigned to the case have been ordered to have no contact with Lorea about it, Lorea "do[es] not know the precise details of this barrier." Affidavit of Robert P. Lorea p.2, (dkt. no. 339) at Exhibit C. Thus, the screened attorney is unsure of the screen's parameters and merely knows that a screen is in place. <u>Id.</u> This aspect of the screen therefore is ineffective because the attorney for whom BG implemented the screen should at least know from whom, what, and in what manner he is being screened.

**MEMORANDUM OPINION AND ORDER GRANTING THE DEFENDANT'S MOTION
TO VACATE THE COURT'S ORDER GRANTING THE PLAINTIFF'S
MOTION FOR SUBSTITUTION OF COUNSEL**

Although BG crafted its screen to conform to relevant case law standards, that does not end this Court's inquiry; it must resolve any doubts about the screening procedures used by BG "in favor of disqualification" without regard for "hair-splitting nicety." Clarkson, 567 F.2d at 273 n.3. The fact remains that Lorea spent 55% to 60% of his time working on Ford matters while employed at FSB. (Dkt. no. 365 at 3.) Beyond that, he also worked on Ford Bronco II roll-over cases, including this case and the companion Sandridge case. Id. at 5. Given all this, as well as BG's size and limited locations, the Court cannot say with confidence that Lorea may not come into contact with, or inadvertently relay, confidential information to "the specific attorneys responsible for the present representation." Schiessle, 717 F.2d at 421 (citing LaSalle, 703 F.2d at 259). Moreover, even though a screen is in place, the Court is troubled by the fact that Lorea "do[es] not know the precise details of this barrier." Affidavit of Robert P. Lorea p.2, (dkt. no. 339) at Exhibit C.

## IV. Conclusion

Because the Court has doubts about the effectiveness of the screening procedures employed by Bailey & Glasser, it resolves the present conflict in favor of disqualification in order to avoid the

## MEMORANDUM OPINION AND ORDER GRANTING THE DEFENDANT'S MOTION TO VACATE THE COURT'S ORDER GRANTING THE PLAINTIFF'S MOTION FOR SUBSTITUTION OF COUNSEL

appearance of impropriety and preserve the public's trust and confidence in the judicial system. <u>CSX</u>, 2006 WL 3203419 at *5 (citation omitted).   The Court, therefore, **DISQUALIFIES** the law firm of Bailey & Glasser from representing Lester in this matter, and **GRANTS** Ford Motor Company's Motion to Vacate (dkt. no. 328) its earlier Order (dkt. no. 322).

It is so **ORDERED**.

The Court **DIRECTS** the Clerk to transmit copies of this Order to counsel of record.

DATED: October 17, 2008.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE